# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 21-355


**CALVIN W. BRAXTON, SR.**

**VERSUS**

**LOUISIANA STATE TROOPERS ASSOCIATION, ET AL.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. 90,284A
HONORABLE JIMMIE C. PETERS, DISTRICT JUDGE, AD HOC

**\*\*\*\*\*\*\*\*\*\***

**BILLY HOWARD EZELL**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Billy Howard Ezell, John E. Conery, and Van H. Kyzar, Judges.


**AFFIRMED.**

**Floyd J. Falcon, Jr.**
**Avant & Falcon**
**P. O. Box 2667**
**Baton Rouge, LA 70821**
**(225) 387-4462**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Louisiana State Troopers Association**

**Jeff Landry**
**Attorney General**
**Steven M. Oxenhandler**
**Special Assistant Attorney General**
**Michael John O'Shee**
**Special Assistant Attorney General**
**P. O. Box 6118**
**Alexandria, LA 71301**
**(318) 445-6471**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Jay Oliphant**

**Jill L. Craft**
**W. Brett Conrad, Jr.**
**Kaitlin A. Wall**
**329 St. Ferdinand Street**
**Baton Rouge, LA 70802**
**(225) 663-2612**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
**Calvin W. Braxton, Sr.**

**Jeff Landry**
**Attorney General**
**Ben L. Mayeaux**
**Special Assistant Attorney General**
**Jennie Porche Pellegrin**
**Special Assistant Attorney General**
**One Petroleum Center, Suite 200**
**1001 West Pinhook Road**
**Lafayette, LA 70503**
**(337) 237-7000**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Louisiana Department of Public Safety & Corrections (Office of State Police)**

**Mary Ann M. White**
**Shows, Cali & Walsh, LLP**
**628 St. Louis Street**
**Baton Rouge, LA 70802**
**(225) 346-1461**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Louisiana State Troopers Association**

**EZELL, Judge.**

Calvin Braxton filed a defamation suit against the State of Louisiana, Department of Public Safety and Corrections, Office of State Police (State Police); Louisiana State Trooper Colonel Jay Oliphant; and the Louisiana State Troopers Association (LSTA). The trial court granted a special motion to strike filed by the State Police pursuant to La.Code Civ.P. art. 971, dismissing it from the litigation. A partial motion for summary judgment based on prescription was granted in favor of Colonel Oliphant dismissing the defamation claim based on the content of a written Incident Report dated June 2, 2016. Mr. Braxton appeals both of these rulings.

## FACTS

In written reasons for judgment on the motion for partial summary judgment, the trial court did an excellent job of stating the undisputed facts leading up to this litigation as follows (alteration in original):

> This litigation involves two separate factual scenarios which give rise to Mr. Braxton's claims for defamation damages. The first factual scenario is set out in his May 10, 2018 initial petition naming as defendants Colonel Oliphant and the Louisiana State Troopers Association (hereinafter "LSTA"), a nonprofit entity organized to represent the interests of its members. These claims arise from an Incident Report bearing the date of June 2, 2016 (hereinafter referred to as "the Incident Report"), prepared by Colonel Oliphant, and filed through proper channels with his employer, the State of Louisiana, Department of Public Safety and Corrections, Office of State Police (hereinafter "the State Police").

> The second factual scenario is set out in Mr. Braxton's February 20, 2020 supplemental and amending petition which names Colonel Oliphant and the State Police as defendants. These claims arise from a second incident report dated March 2, 2018, prepared by Colonel Oliphant, filed through proper channels with the State Police and used by the State Police in a subsequent investigation involving Mr. Braxton. The consequences of this second Incident Report are not before the court in this motion for partial summary judgment. [This report is involved in the special motion to strike action].

Mr. Braxton is a lifelong resident of Natchitoches Parish, a successful business man, and has been active in civic and political affairs at the local and state level during his career. The issue now before the court involves Mr. Braxton's two-year service as a member of the governing board of a public body, the Louisiana State Police Commission (hereinafter "the Commission"). In 2015 Governor Bobby Jindal appointed Mr. Braxton to the Commission and Mr. Braxton took the required oath of office on July 7, 2015. He served as a member of the Commission until July 21, 2017, when he submitted his resignation letter to Governor John Bel Edwards.

During his time on the Commission, Mr. Braxton took issue with a number of the activities of LSTA which he considered improper and/or illegal. These open disputes resulted in LSTA requesting that Governor Edwards hold a public hearing pursuant to La.Const. art. 10, § 43(D) for the purpose of determining whether Mr. Braxton should be removed from his position on the Commission. LSTA made its request in writing on July 11, 2016, and when the Governor's office did not respond, LSTA followed up its request with a second letter dated June 19, 2017. The Governor did not schedule a public hearing. Instead, he met personally with Mr. Braxton, and the result of the meeting was Mr. Braxton's July 21, 2017 letter of resignation.

This litigation came about because LSTA did not use the standing disagreements with Mr. Braxton as grounds for his removal as a member of the Commission. Instead, LSTA used the content of the Incident Report prepared by Colonel Oliphant. Specifically, LSTA asserted that Mr. Braxton had overstepped his authority in attempting to punish a Louisiana State Trooper for arresting his daughter for traffic violations. The two-page July 11, 2016 letter to Governor Edwards lists twenty (20) grounds for Mr. Braxton's removal, all relating directly or indirectly to the content of the Incident Report.

The traffic stop at issue was routine. On the evening of Friday, December 4, 2015, Louisiana State Trooper Jayson Linebaugh stopped a vehicle for speeding and improper lane changes. His on-the-scene investigation established that the driver had been drinking alcoholic beverages and appeared intoxicated; and based on his initial conclusions, Trooper Linebaugh transported the driver to the Natchitoches Parish Detention Center where she performed the Intoxilyzer 9000 breath test. After reviewing the results of the breath [test] Trooper Linebaugh issued four citations to the driver: (1) speeding 68 miles per hour in a 55 mile per hour zone, a violation of La.R.S. 32:61; (2) improper lane change, a violation of La.R.S. 32:79; (3) a parish ordinance open container violation; and (4) operating a vehicle while intoxicated, a violation of La.R.S. 14:98. The driver of the vehicle was at some point identified as Mr. Braxton's daughter, a competent major.

2

Trooper Linebaugh performed his duties properly and in a professional manner that evening; and Mr. Braxton's daughter subsequently took responsibility for the charges against her without protest or complaint. At the time of the December 4, 2015 traffic stop, Colonel Oliphant (then Captain Oliphant) was Trooper Linebaugh's superior officer.

While the truthfulness of the content of the June 2, 2016 Incident Report is disputed, the report itself paints a vivid picture of Colonel Oliphant['s] assertions of improper and abusive activity by Mr. Braxton with regard to his reaction to his daughter's arrest and the subsequent charges against her. It contains among other things, assertions that:

> Colonel Oliphant telephoned Mr. Braxton the day after his daughter's arrest strictly as a courtesy because of his position on the Commission and was informed by Mr. Braxton that he was already aware of the incident; but that his concern was whether Trooper Linebaugh should have given his daughter "professional courtesy" and should not have arrested her; and that Trooper Linebaugh might have been "targeting" his family. The conversation was ended with Mr. Braxton asking Colonel Oliphant to inquire whether Trooper Linebaugh knew him. On Wednesday of the next week, Colonel Oliphant did just that, and was informed by the officer that he did not know Mr. Braxton.

> After his conversation with Mr. Braxton, Colonel Oliphant conferred with Trooper Linebaugh who denied knowing Mr. Braxton, but acknowledged that even if he had known the connection between Mr. Braxton and the driver of the vehicle involved, that knowledge would not have affected him performing his duty. This conversation occurred on December 9, 2015, and Colonel Oliphant subsequently informed Mr. Braxton of Trooper Linebaugh's answer to his (Mr. Braxton's) inquiry. When informed of Trooper Linebaugh's response, Mr. Braxton accused the officer of not telling the truth, and further stated that "he had known Troopers to get fired for lying." Mr. Braxton asserted that, because of his failure to give his daughter appropriate courtesy, "he might not help Trooper Linebaugh if he gets in a bind on the job" and has to appear before the Commission; that he was not through with the situation, and that he was going to call the Superintendent of the State Police and inform him of his displeasure. Mr. Braxton did call the Superintendent who relayed that telephone conversation to Colonel Oliphant.

> The next communication between Mr. Braxton and Colonel Oliphant occurred on December 12, 2015, when

Mr. Braxton called to ask what was going to be done to Trooper Linebaugh for his actions. Being dissatisfied with Colonel Oliphant's response, Mr. Braxton suggested that Trooper Linebaugh needed to be temporarily assigned to the New Orleans area for sixty to ninety days "to get his mind straight," because the officer "was out of control." This last statement was a reference to Trooper Linebaugh arresting the local Sheriff's son on a traffic violation. Mr. Braxton told Colonel Oliphant that he had spoken to some members of the Commission who advised him that members "were not to be touched."

Two days later Mr. Braxton and Colonel Oliphant had another conversation wherein Mr. Braxton stated that he had again telephoned the Superintendent concerning Trooper Linebaugh's transfer and the Superintendent referred him back to Colonel Oliphant. Mr. Braxton suggested in the conversation that he was not going to stop until "he gets what wants[,]" and that the issue seemed to be how much "stroke" he had in his position as a member of the Commission.

Before filing his Incident Report, Colonel Oliphant communicated with David T. Young, LSTA's Executive Director, to discuss the situation and to seek support from LSTA if needed in the future. While offering encouragement to Colonel Oliphant, Mr. Young suggested that he report the matter through channels to the State Police and, because it would be a public record, LSTA would have access to the complaint if needed in the future.

Colonel Oliphant did not immediately accept Mr. Young's advice. Instead, he contacted his supervisor, Colonel Kevin W. Reeves, and discussed Mr. Young's suggestion that he report the matter through channels. Colonel Reeves was already aware of the situation, having been updated from time to time by Colonel Oliphant. The result of the conversation was that Colonel Reeves told Colonel Oliphant that the documentation of the matter should be made within the State Police system and not through an external organization such as LSTA.

Mr. Braxton filed his original suit for defamation and/or defamation per se against the LSTA and Colonel Oliphant on May 10, 2018, based on the June 2016 Incident Report. Subsequently, Colonel Oliphant filed a motion for partial summary judgment asking that Mr. Braxton's claims relating to the June 2, 2016 Incident Report, and its alleged republication based on its attachment by the LSTA to its

letters to the Governor, be dismissed with prejudice. In the alternative, Colonel Oliphant sought dismissal of Mr. Braxton's claims of defamation per se regarding alleged defamation through accusation of crimes in the 2016 report be dismissed.

On February 19, 2020, Mr. Braxton filed a supplemental and amending petition naming the State Police as a defendant. Mr. Braxton asserted he learned of a publication dated March 2, 2018, during Trooper Oliphant's deposition. Mr. Braxton argues that Trooper Oliphant falsely accused him of murder in a death that was determined to be a suicide which occurred decades earlier. He alleged that these statements were defamatory and/or defamatory per se, published with actual malice, and republished.

The State Police filed a special motion to strike Mr. Braxton's defamation claim pursuant to La.Code Civ.P. art. 971 on August 11, 2020. A hearing on both Colonel Oliphant's partial motion for summary judgment and the State Police's motion to strike was held on October 5, 2020.

The trial court issued separate reasons for judgment on November 9, 2020, granting both motions. Judgment granting the partial motion for summary judgment and dismissing Mr. Braxton's claims against Colonel Oliphant for defamation arising out of the content of the June 2, 2016 Incident Report as prescribed was signed on November 9, 2020. Mr. Braxton's other pending claims against Colonel Oliphant were reserved. Judgment granting the State Police's motion to strike was also signed on November 9, 2020. A judgment amending the phraseology of the judgment on the motion to strike to assert that the dismissal of Mr. Braxton's claim was with prejudice was signed on December 18, 2020. Mr. Braxton appealed both judgments to this court.

5

## SPECIAL MOTION TO STRIKE

<u>Definition of Person</u>

The State Police was added as a defendant based on a second Incident Report authored by Colonel Oliphant dated March 2, 2018. In the Incident Report, Colonel Oliphant describes a suspicious vehicle at the main entrance to his subdivision, near his home, about the same time his son came home from school. He followed the vehicle and got the license number. Colonel Oliphant was concerned that he and his family were being watched creating concern for their safety. He also had concerns about the death of a woman years ago, which had been ruled a suicide. Colonel Oliphant was told that the woman had been dating Mr. Braxton at the time and that her death was suspicious. He made a request that the State Police review the case file regarding her death. He also requested that the State Police make security checks around his home.

In his supplemental petition adding the State Police as a defendant, Mr. Braxton alleged that Colonel Oliphant and the State Police "continued to repeat and publish the false allegations that Petitioner committed a homicide since the June 26, 2019 deposition of Oliphant." Mr. Braxton further alleged that "these statements are false, defamatory, defamatory per se, were published with actual malice, and have been republished throughout the State of Louisiana by defendant Oliphant and State Police[.]"

The State Police filed a special motion to strike the defamation claim based on La.Code Civ.P. art. 971, which provides in pertinent part:

> (A)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the

6

court determines that the plaintiff has established a probability of success on the claim.

The Louisiana Legislature enacted the anti-SLAPP (Strategic Lawsuit Against Public Participation) provision, Article 971, in 1999 "as a procedural device to be used in the early stages of litigation to screen out meritless claims brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances." *Aymond v. Dupree*, 05-1248, p. 7 (La.App. 3 Cir. 4/12/06), 928 So.2d 721, 727, *writ denied*, 06-1729 (La. 10/6/06), 938 So.2d 85; *Hatfield v. Herring*, 54,048 (La.App. 2 Cir. 8/11/21), 326 So.3d 944, *writ denied*, 21-1377 (La. 12/7/21), ___ So.3d ___. A court of appeal makes a de novo review of a trial court's ruling on a special motion to strike pursuant to Article 971 because issues of law are involved. *Id.*

Article 971 applies to a "person's" right of petition and free speech under the United States or Louisiana Constitution. No one has disputed that the State is a juridical person pursuant to La.Civ.Code art. 24. Entitlement to a motion to strike pursuant to Article 971 requires that one be acting "in furtherance" of constitutional rights. Mr. Braxton argues that the State Police is not a "person" which is entitled to protections afforded by the constitutional right of freedom of speech.

Louisiana Civil Code Article 24 establishes two types of persons, natural and juridical. Natural person are human beings while juridical persons are entities to which the law attributes a personality, like a corporation or a partnership. *Id.* Pursuant to La.R.S. 36:401(A), the State Police as part of the Department of Public Safety and Corrections is "a body corporate with the power to sue and be sued."

As explained in Comment (c) to La.Civ.Code art. 24:

[J]uridical persons are classified either as private persons or public persons. A public person is governed by rules of public law; a private

7

> person is governed by rules of private law. The state and its political subdivisions have dual personality. At times they act as public persons in a sovereign capacity and at times as private persons in the capacity of a citizen or a private corporation.

Furthermore, La.Code Civ.P. art. 5251(12), defines "person" as a corporation.

In support of his position that juridical persons are not entitled to the constitutional protections of freedom speech, Mr. Braxton relies on a recent opinion from the first circuit, *LaCerte v. State*, 19-1401 (La.App. 1 Cir. 1/4/21), 317 So.3d 763, *writ denied*, 21-193 (La. 3/23/21), 313 So.3d 272.

*LaCerte* involved a defamation suit by a former state employee against the State, the Louisiana Legislative Auditor and State Inspector General, individually and in their official capacities. He alleged that a report issued by the officials wrongfully accused him of criminal conduct, falsifying public records, and engaging in questionable hiring. The defendants filed a joint motion to strike pursuant to Article 971. The trial court granted the defendants' motion to strike finding that they were "persons" for the purposes of Article 971.

The first circuit reversed this decision finding that the State, Legislative Auditor, and Inspector General did not fall withing the scope of the equal protection clauses of the United States and Louisiana Constitutions. The first circuit held that the defendants were juridical persons, rather than natural persons, and the speech of juridical persons is not constitutionally protected.

The first circuit acknowledged that this court was faced with this identical issue and had to decide whether the Town of New Llano was a "person" entitled to a motion to strike pursuant to La.Civ.Code art. 971 in *Hunt v. Town of New Llano*, 05-1434 (La.App. 3 Cir. 5/3/06), 930 So.2d 251, *writ denied*, 06-1852 (La. 10/27/06), 939 So.2d 1283. We held that municipalities are "persons" as contemplated by

8

La.Civ.Code art. 24 and La.Code Civ.P. art. 5251(12). Therefore, we concluded that the town had the ability to file a motion to strike under Article 971.

In trying to differentiate the issue before it in *LaCerte*, 317 So.3d 763, the first circuit, in footnote 7, stated that this court, and other courts which held that municipalities were juridical persons capable of bringing an Article 971 motion,

did not directly address the issue of whether governmental entities enjoyed the constitutional protection of freedom of speech. The first circuit determined that Article 971 "sets forth the threshold requirements that the communication at issue arise from an act in furtherance of the speaker's constitutional right to free speech *and* be made in connection with a public issue." *LaCerte*, 317 So.3d at 772-73. The first circuit further decided that a constitutional right to free speech must exist independent of the definitions set forth in Article 971(F), which the first circuit concluded defined what types of protected speech are considered public issues.

In addition to *Hunt*, 930 So.2d 251, several courts have found that municipalities, corporations, and governmental entities are "persons" entitled to assert a special motion to strike pursuant to La.Civ.Code art. 971, including the first circuit. *Patton v. O'Bannon*, 11-989 (La.App. 1 Cir. 12/21/11) (unpublished opinion), *writ denied*, 12-223 (La. 3/30/12), 85 So.3d 120 (issuance of press release by district attorney's office constituted acts in further of its free speech rights under Article 971); *Regan v. Caldwell*, 16-659 (La.App. 1 Cir. 4/7/17), 218 So.3d 121, *writ denied*, 17-963 (La. 4/6/18), 239 So.2d 827 (action against office of attorney general arose from an act in the exercise of free speech in connection of a public issue); *Thomas v. City of Monroe*, 36,526 (La.App. 2 Cir. 12/18/02), 833 So.2d 1282 (corporate television station was "person" within contemplation of Article 971); *Williams v. New Orleans Ernest N. Morial Convention Ctr.*, 11-1412 (La.App. 4 Cir.

9

5/11/12), 92 So.3d 572, *cert. denied*, 569 U.S. 963, 133 S.Ct. 2033 (2013) (city convention center entitled to file a special motion to strike as a "person")

The United States Supreme Court has also held that corporations are entitled to First Amendment freedom of speech protection. *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 130 S.Ct. 876 (2010)(citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407 (1978)). The Supreme Court noted that "[c]orporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Id.* at 343 (quoting *Bellotti*, 435 U.S. at 783).

Citing *Citizens United*, this court held that unions and corporations are entitled to First Amendment protection guaranteeing freedom of expression. *Lake Charles Police Officers' Assoc. Local 830 AFL-CIO v. Roach*, 16-719 (La.App. 3 Cir. 2/15/17), 211 So.3d 1173, *writ denied*, 17-461 (La. 5/1/17), 221 So.3d 70.

Article 971 itself provides support for the fact that governmental entities such as the State Police are included in the entities entitled to a special motion to strike. As noted by the dissent/concurrence in *LaCerte*, 317 So.2d 763, 781 (*Vargas v. City of Salinas*, 46 Cal. 4th 1, 205 P.3d 207 (2009)), "the focus of Article 971 is to protect *types of speech*, rather than a *particular class of 'persons.'*" In defining the type of speech that is protected, Article 971(F)(1) specifically defines an "'Act in furtherance of a person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue'":

> (a) Any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law.

> (b) Any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official body authorized by law.

10

(c) Any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest.

(d) Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

The statute did not simply define "public issue" but defined constitutionally protected speech on a public issue. The speech at issue in the case before us involves the type of speech that is protected as defined by Article 971, in which the State Police are acting as private persons in the capacity of a citizen pursuant to La.Civ.Code art. 24.

In the case before us, Colonel Oliphant filed an Incident Report with his employer requesting a personal threat assessment regarding the capabilities of Mr. Braxton to potentially harm him or his family. Clearly, this was a writing before an official body, the Department of Public Safety & Corrections, in connection with an investigation before it. As noted by the dissent in *LaCerte*, 317 So.3d at 782, "the type of speech at issue herein is indispensable to decision-making in a democracy and, thus, should not lose its constitutional significance and protection based solely on the identity of the speaker."

Mr. Braxton's cause of action for defamation arises out of both the United States and Louisiana Constitutions. U.S. Const. First Amendment; La.Const. Art. 1, § 7. Louisiana Constitution Article 1, § 7 specifically refers to a "person" as subject to an abuse of that freedom. He filed suit arguing that the Defendants abused their freedom of speech. Therefore, he bases his cause of action on the fact that a "person" abused its freedom of speech. How can an entity abuse the right to free speech if the right never existed in the first place? When our Legislature enacted Article 971 in 1999, it "'is presumed to have acted with deliberation and to have enacted a statute

11

in light of the preceding statutes involving the same subject matter.'" *Kocher v. Truth in Politics, Inc.*, 20-1153, p. 2 (La. 12/22/20), 307 So.3d 182, 184 (quoting *Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc.*, 06-582, p. 10 (La. 11/29/06), 943 So.2d 1037, 1045.) If the Legislature intended for only natural persons to have the right to file a special motion to strike, it could have included such language in Article 971.

We do agree with the first circuit in *LaCerte*, 317 So.3d at 770, that a juridical person, "as a creature of the law… has no more legal capacity than the law allows." In the present case, the Legislature has not limited a juridical person's ability to file a special motion to strike under Article 971. The Legislature was well aware that defamation actions are filed against juridical persons and these entities must also defend these actions.

Probability of Success

Mr. Braxton alternatively argues that the trial court erred in finding that the State Police met its burden of proof of entitlement to a special motion to strike under Article 971. Mr. Braxton asserts that the March 2018 Incident Report requesting a personal threat assessment was not part of any legitimate law enforcement function, but rather were designed to defame him. In his report, Colonel Oliphant also requested that the death of a woman that happened twenty years ago and was ruled a suicide should be reexamined because he heard that Mr. Braxton may have had something to do with her death. Mr. Braxton claims the information in this report was republished by the State Police throughout Shreveport, Natchitoches, and the law enforcement community. He argues that Colonel Oliphant's allegations of the possibility of murder are defamatory per se, which were also statements of the State Police because it reviewed and approved the report of its employee.

The burden under Article 971 is initially on the mover to establish that its statements arise from its right to free speech or petition in relation to a public issue. *Hunt*, 930 So.2d 251. As previously discussed, we find that the State Police met its burden of proof under this first prong. The burden then shifts to the plaintiff to establish a probability of success on his claim. *Id.*; *Saucier v. Washington*, 17-556 (La.App. 3 Cir. 9/20/17), 229 So.3d 19.

There is no dispute that the investigation by the State Police concerning Colonel Oliphant's March 2018 Incident Report involved a "written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official body authorized by law." Article 971(F)(1)(b). Therefore, the burden was on Mr. Braxton to establish a probability that he would be successful on his claim.

> Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name. "Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." The fault requirement is often set forth in the jurisprudence as malice, actual or implied. Thus, in order to prevail on a defamation claim, a plaintiff must prove " 'that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages.' " If even one of the required elements of the tort is lacking, the cause of action fails.

> Defamatory words are, by definition, words which tend to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person, or otherwise expose a person to contempt or ridicule. Words which convey an element of personal disgrace, dishonesty, or disrepute are defamatory. The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is ultimately a legal question for the court. The question is answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense. To be actionable, the words must be communicated or "published" to someone other than the plaintiff.

In Louisiana, defamatory words have traditionally been classified into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se. When a plaintiff proves publication of words that are defamatory per se, the elements of falsity and malice (or fault) are presumed, but may be rebutted by the defendant. The element of injury may also be presumed.

When the words at issue are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, the elements of falsity, malice (or fault) and injury. In cases involving statements made about a public figure, where constitutional limitations are implicated, a plaintiff must prove actual malice, *i.e.*, that the defendant either knew the statement was false or acted with reckless disregard for the truth.

*Costello v. Hardy*, 03-1146, pp. 12-14 (La. 1/21/04), 864 So.2d 129, 139-41

(footnotes omitted)(citations omitted).

The trial court found that "the only thing in the record supporting Mr. Braxton's theory of recovery against the State Police is the self-serving allegations in his second amending petition," which would not be sufficient to prove defamation. The trial court also found that none of the many evidentiary exhibits support Mr. Braxton's theory of liability.

Clearly, the State Police conducted an investigation as a result of the March 18 Incident Report filed by Colonel Oliphant requesting a level-of-threat assessment of Mr. Braxton. Mike Turner then initiated an investigation into the death of the woman. The investigation resulted in the death continuing to be ruled a suicide. Mr. Braxton argues that this investigation led to the publication of defamatory statements.

In Louisiana, privilege is a defense to a defamation action. The doctrine of privilege rests upon the notion that sometimes, as a matter of public policy, in order to encourage the free communication of views in certain defined instances, one is justified in communicating defamatory information to others without incurring liability. Privileged communications are divided into two general classes: (1) absolute; and

14

(2) conditional or qualified. An absolute privilege exists in a limited number of situations, such as statements by judges and legislators in judicial and legislative proceedings. A conditional or qualified privilege arises in a broader number of instances. In fact, there are a variety of situations in which the interest that an individual is seeking to vindicate or to further is regarded as sufficiently important to justify some latitude for making mistakes so that publication of defamatory statements is deemed to be conditionally or qualifiedly privileged. It is impossible to reduce the scope of a conditional or qualified privilege to any precise formula. Nevertheless, the elements of the conditional privilege have been described as "good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner and to proper parties only." The privilege, it has been held, "arises from the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate."

*Kennedy v. Sheriff of E. Baton Rouge*, 05-1418, pp. 16-17 (La. 7/10/06), 935 So.2d 669, 681-82 (citations omitted).

We agree that Mr. Braxton cannot establish that there was an unprivileged communication to a third person. Once the State Police received Colonel Oliphant's March 2018 Incident Report, it was obligated to investigate, which it did. We agree with the trial court that the State Police conducted an investigation relative to the March 2018 Incident Report and only questioned a few necessary people. The investigation quickly confirmed that the woman had committed suicide and that was the end of the investigation.

We agree with the trial court that Mr. Braxton failed to establish a probability of success on the merits of his claim for defamation against the State Police.

**PARTIAL SUMMARY JUDGMENT**

The trial court dismissed Mr. Braxton's suit against Colonel Oliphant arising from republication of the June 2016 Incident Report on the basis that the action was prescribed. When Mr. Braxton filed suit against Colonel Oliphant on May 15, 2018,

15

it was well over a year since the first Incident Report was filed on June 2, 2016. However, Mr. Braxton argues that republication of the 2016 report in the June 19, 2017 letter to the Governor was within one year period of the filing of his suit. Mr. Braxton argues the trial court erred in not finding that the republication was a natural and probable consequence of Colonel Oliphant's original report and that the claims arising from republication are not prescribed. Mr. Braxton contends that Colonel Oliphant's decision to author a report, which would be a public record, versus authoring an affidavit, renders him liable.

"A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact." *N. Am. Fire & Cas. Co. v. State Farm Mut. Auto. Ins. Co.*, 03-300, p. 3 (La.App. 3 Cir. 10/1/03), 856 So.2d 1233, 1235, *writ denied*, 03-3334 (La. 2/13/04), 867 So.2d 694. Appellate courts review motions for summary judgment de novo, using the same criteria that the trial court considers in determining whether summary judgment is appropriate. *Dunn v. City of Kenner*, 15-1175 (La. 1/27/16), 187 So.3d 404.

The summary judgment procedure is favored and "designed to secure the just, speedy, and inexpensive determination of every action[.]" La.Code Civ.P. art. 966(A)(2). Appellate courts review the grant or denial of a motion for summary judgment de novo, "using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; *i.e.*, whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law." *Samaha v. Rau*, 07-1726, p. 4 (La. 2/26/08), 977 So.2d 880, 882-83; La.Code Civ.P. art. 966(A)(3).

The moving party has the burden of proof unless the mover "will not bear the burden of proof at trial on the issue that is before the court on the motion for

16

summary judgment[.]" La.Code Civ.P. art. 966(D)(1). In that case, the mover need only:

> [P]oint out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

*Id.*

"Although typically asserted through the procedural vehicle of the peremptory exception, the defense of prescription may also be raised by motion for summary judgment." *Hogg v. Chevron USA, Inc.*, 09–2632, 09–2635, p. 6 (La. 7/6/10), 45 So.3d 991, 997; *Trahan v. BP Am. Prod. Co.*, 16-267 (La.App. 3 Cir. 12/7/16), 209 So.3d 166, *writ denied*, 17-22 (La. 3/24/27), 216 So.3d 815. "When prescription is raised by motion for summary judgment, review is *de novo*, using the same criteria used by the district court in determining whether summary judgment is appropriate." *Hogg,* 45 So.3d at 997 (footnote omitted).

> The general rule is that one who publishes a defamatory statement will not be held liable for the repetition of it by others. 53 C.J.S. Libel and Slander § 85. When, however, the second publication is a natural and probable consequence of the first, the initial publisher is responsible for it. Giordano v. Tullier, 139 So.2d 15 (La.App. 4 Cir. 1962); Cormier v. Blake, 198 So.2d 139 (La.App. 3 Cir. 1967). Whether this has occurred is a question of fact. See, Annotation, Defamation— Republication by Others, 96 A.L.R.2d 373. Where there were circumstances, known to the original defamer at the time of his publication that might reasonably lead him to expect a repetition, he is responsible for it. Annotation, supra, § 3. The nature of this factual issue indicates that summary judgment is infrequently appropriate.

*Davis v. Nat. Broad. Co.*, 320 F.Supp. 1070, 1072 (E.D. La. 1970).

Mr. Braxton argues that republication by the LSTA in a letter to the Governor a year later is a natural and probable consequence of Colonel Oliphant's actions. His argument is based on the fact that Colonel Oliphant chose to document the

17

circumstances of Mr. Braxton's daughter's arrest, and subsequent communications regarding the event with Mr. Braxton, by means of an incident report versus an affidavit, because he wanted the incident report to be a public record.

We first observe that whether Colonel Oliphant included the information in an initial report, or an affidavit, is of no moment, because it is the information that is contained in the document that is considered a public record and not the document itself. *State v. Campbell*, 566 So.2d 1038 (La.App. 3 Cir.), *writ denied*, 567 So.2d 111 (La.1990); *Elliot v. Taylor*, 92-1426 (La.App. 4 Cir. 1/29/93), 614 So.2d 126. If an affidavit contained the same information as the initial report, it would be subject to a public records exemption pursuant to La.R.S. 44:3(4).

Colonel Oliphant testified that he did not play any part in any of the two letters written to the Governor by the LSTA. He testified that he did not know that the State Police was going to attach his 2016 Incident Report to these two letters. He also played no part in writing the letters to the Governor and did not give permission to attach his report to the letters. Colonel Oliphant did agree that he knew the report would become a public record and that the LSTA could get the report through a public records request.

David Young, executive director of the LSTA at the time, stated that the decision to attach the 2016 Incident Report to the letters to the Governor occurred after receipt of the report. He explained that Colonel Oliphant never asked him to attach the report to the letter and Colonel Oliphant had no input on the letter to the governor. Mr. Young testified that he did not give a copy of the report to the news media and had no idea how the news media got the report. Mr. Young explained that he was approached by Mr. Braxton expressing dissatisfaction with the situation involving his daughter. Mr. Young believed that he did request Colonel Oliphant to

prepare a report because of his concern of the accusations toward the State Police by Mr. Braxton. Colonel Oliphant agreed that Mr. Young suggested he document the circumstances because he supported Officer Linebaugh's actions in arresting Mr. Braxton's daughter. Colonel Oliphant testified that he was concerned for Trooper Linebaugh due to the fact that Mr. Braxton served on the State Police Commission, as he was concerned Mr. Braxton could not be impartial if Trooper Linebaugh came before the commission on a disciplinary action.

Colonel Oliphant was also approached by Sergeant Rodney Hyatt with the Louisiana State Police about submitting an affidavit instead of testifying before the commission. Colonel Oliphant said as far as he was concerned, a report and affidavit were the same thing.

Jay O'Quinn, president of the LSTA at the time, stated that it was the board who made a decision to send the letter to the Governor. He recalled hearing that a report had been prepared by Colonel Oliphant and, once the LSTA knew about the report, they were waiting for it to become part of the department records so they could make a public records request. The LSTA wanted to read the document so it could decide what course to take.

The fact that the State Police attached Colonel Oliphant's report to a letter to the Governor more than a year after the report was authored could not have been anticipated by Colonel Oliphant. Furthermore, even if claims based on the attachment of the report to the first letter had not prescribed, there is still no evidence that it was probable that Colonel Oliphant's report would be attached to a letter to the Governor or used in any other manner, other than to document Colonel Oliphant's concerns for Trooper Linebaugh, based on what occurred following the arrest of Mr. Braxton's daughter.

19

Therefore, looking at the circumstances known to Colonel Oliphant at the time he filed the 2016 Incident Report, we find that partial summary judgment was proper. For the reasons set forth in this opinion, we affirm the decision of the trial court in granting the special motion to strike filed by the State Police, pursuant to La.Code Civ.P. art. 971, dismissing it from the litigation. We also affirm the trial court's granting of the partial motion for summary judgment in favor of Colonel Oliphant regarding prescription claims based on the content of a written Incident Report dated June 2, 2016. All costs of this appeal are assessed to Calvin Braxton.

**AFFIRMED.**